UNITED STATES BANKRUPTCY COURT      <u>NOT FOR PUBLICATION</u>
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

In re:      Chapter 11

NAVILLUS TILE, INC.,      Case No. 17-13162 (DSJ)

         Debtor.

------------------------------------------------------------------x
NAVILLUS TILE, INC.,

         Plaintiff,

-against-      Adv. Proc. No. 17-01245 (DSJ)


CNY CONSTRUCTION 701 LLC,

         Defendant.

------------------------------------------------------------------x

## <u>MEMORANDUM OPINION AND ORDER RESOLVING<br>NAVILLUS TILE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**A P P E A R A N C E S :**

**PECKAR & ABRAMSON, P.C.**
*Counsel for Navillus Tile, Inc., d/b/a Navillus Contracting*
1325 Avenue of the Americas, 10th Fl.
New York, NY 10019
By:    Howard M. Rosen, Esq.

**RICH, INTELISANO & KATZ, LLP**
*Counsel for CNY Construction 701 LLC*
915 Broadway, Suite 900
New York, NY 10010
By:    Daniel E. Katz, Esq.
       Robert J. Howard, Esq.

Before the Court is Plaintiff Navillus Tile, Inc.'s ("**Navillus**") motion for partial summary

judgment (the "**Motion**"). In this adversary proceeding, Navillus, a trade contractor, is suing

Defendant CNY Construction 701 LLC ("**CNY**"), the general contractor on a project known as

701 Seventh-Mixed Use Development, Seventh Avenue and 47th Street (the "**Project**"), for, *inter*

*alia*, money allegedly earned but not paid in connection with certain superstructure concrete work

(the "**Work**") which Navillus allegedly performed pursuant to a trade contract between Navillus and CNY (the "**Contract**"). [*See generally* ECF No. 106-9].[1]  CNY, in turn, is countersuing Navillus for, *inter alia*, "back-charges" for costs which CNY allegedly incurred to remediate alleged deficiencies in Navillus's Work, and asserted "delay damages" allegedly caused by Navillus. [ECF No. 106-10 at 9–22].

Navillus acknowledges that a trial will be required to fully resolve the parties' dispute, but it seeks partial summary judgment as to the following contentions: (i) Navillus is entitled to a roughly $2,505,187 payment from CNY (the "**Unpaid Total**"), consisting of roughly $1,623,328[2] in unpaid payment applications for Work allegedly completed (the "**Unpaid Applications**")[3] and roughly $881,859 allegedly held by CNY as retainage pending completion of the Work (the "**Retainage**"), all subject to a possible set-off based on disputed back-charges to be proved by CNY at trial; (ii) CNY's non-payment of the Unpaid Total materially breached the Contract; (iii) CNY's non-payment violated the New York Prompt Payment Act, N.Y. Gen. Bus. Law § 756-a *et seq.* (the "**PPA**"); (iv) the Court should dismiss CNY's counterclaims for delay damages on behalf of CNY and 20 TSQ Lessee LLC, who eventually became the owner of the Project ("**20 TSQ**" or the "**Successor Owner**"); and (v) all delay damages alleged on behalf of CNY and 20 TSQ are contractually capped at $1,000,000. [ECF No. 105 at 1–2; ECF No. 108 at 1].

---

[1] Unless otherwise specified, references to the Case Management/Electronic Case Filing ("**ECF**") docket are to the above-captioned adversary proceeding.  Whenever possible, this Decision cites a document's underlying pagination in the form "ECF No. __ at __."  When that is not possible because of a document's formatting, this Decision cites the page number in the ECF-stamped banner at the top of the page, in the form "ECF No. __ at __ of __."  At times, the Decision also cites paragraph or section numbers.

[2] This Decision uses approximate dollar amounts due to immaterial inconsistencies and inaccuracies in Navillus's submissions.

[3] Navillus uses the terms "payment application," "invoice," and "requisition" seemingly to refer to the same thing. [*E.g.*, Hearing Tr. at 13:3–5].  Because Navillus most frequently uses the term "payment application," and because the documents themselves are labeled "Application for Payment" [*e.g.*, ECF No. 106-19 at 2 of 19], the Decision uses that term.

For the reasons that follow, the Motion is granted to the limited extent that it seeks to cap all delay damages asserted on behalf of CNY and 20 TSQ at $1,000,000, but it is denied in all other respects.

## BACKGROUND

A.    The Contract

On or about April 3, 2014, Navillus entered into the Contract with CNY to perform certain Work on the Project.  [ECF No. 116 at 1].  The scope of Navillus's Work under the Contract included pouring concrete and installing cast-in-place concrete columns, sheer walls, and floor slabs on various floors of a 40-story tower.  [ECF No. 108 at 1; ECF No. 106-1 at 35–53 of 78].  CNY also occasionally had Navillus perform work outside the Contract's scope ("**Extra Work**") resulting from design changes, design issues, and differing site conditions.  [ECF No. 107 at 3].  Navillus would submit "change requests" to CNY for the cost of any such Extra Work, and CNY either would or would not approve the requests.  [*Id.*].  The initial Contract price for Navillus's Work was $28,900,000 [ECF No. 108 at 1; ECF No. 106-1 at 5 of 78], but by the time Navillus had concluded its Work the total contract price, including the price of all approved Extra Work, was roughly $35,274,394 (the "**Final Contract Price**") [ECF No. 107 at 5; ECF No. 106-19 at 2 of 19, 17 of 19].[4]

The Contract incorporated by reference a schedule that imposed various Project deadlines, but, even before Navillus was to start its Work, delays from other aspects of the Project made the originally drafted Navillus deadlines impossible.  [ECF No. 108 at 11].  Even so, once Navillus began its Work, for each month of Work, Navillus submitted a "pencil requisition" to CNY,

---

[4] Navillus is also suing CNY for approximately $899,206 beyond the Final Contract Price for Extra Work allegedly completed by Navillus but unapproved by CNY, but that amount is not at issue on this Motion or included in the Final Contract Price or the Unpaid Total.  [*E.g.*, ECF No. 107 at 3–4; Tr. of Mot. Filed by the Pl. for Partial Summ. J. ("**Hearing Tr.**") at 10:3–7, June 13, 2023].

discussed any billing issues with CNY, and then, after reaching agreement with CNY, sent a final payment application to CNY. [ECF No. 107 at 3]. Navillus understood that CNY would then submit Navillus's payment applications to the owner and developer of the Project—originally, the Witkoff Group LLC, operating as 701 Seventh Property Owner LLC ("**701 Seventh**" or the "**Original Owner**," and, together with the Successor Owner, the "**Owners**")—along with all other trade contractors' payment applications as part of CNY's own payment application. [*Id.*]. CNY paid Navillus for every payment application except for the seven Unpaid Applications, which were for a combined total of approximately $1,623,328. [*Id.* at 4]. According to an April 5, 2021 verified statement provided by CNY to Navillus pursuant to section 76 of the New York Lien Law, CNY had submitted six of these seven Unpaid Applications to the Owners as part of CNY's own request for payment (the "**Submitted Unpaid Applications**"), and the Owners had paid CNY for five of those six. [*Id.*; ECF No. 106-3 at 82 of 87].

By Navillus's account as reflected in the final Unpaid Application (which Navillus submitted to CNY on February 28, 2019, but which CNY never submitted to the Owners), all Work was 100% complete, CNY had paid Navillus approximately $32,769,207, and CNY was still holding approximately $881,860—2.5% of the Final Contract Price—as Retainage. [ECF No. 107 at 5; ECF No. 106-19 at 2 of 19, 17 of 19]. Thus, Navillus is seeking to recover the difference between the $35,274,394 Final Contract Price and the $32,769,207 that CNY has already paid, or about $2,505,187—the Unpaid Total. [ECF No. 107 at 5]. As Navillus's counsel explained during the Hearing, the Unpaid Total consists of "four pieces": (i) about $914,881 for the five Submitted Unpaid Applications for which the Owners paid CNY; (ii) about $700,022 for the one Submitted Unpaid Application for which the Owners did *not* pay CNY; (iii) about $8,422 for the one Unpaid Application which CNY did not submit to the Owners; and (iv) about $881,859 in Retainage. [Hearing Tr. at 14:23–15:20].

4

CNY opposes the Motion, contending that Navillus's Work was often deficient in various respects and caused an additional 94 days of delay to the Project in addition to the delays that preceded Navillus's Work; CNY further contends that Navillus's delays caused CNY and 20 TSQ to incur damages. [*E.g.*, ECF No. 106-10 at 14–15]. Specifically, CNY argues that CNY incurred approximately $1,788,245 in expenses to remedy Navillus's deficient Work, which CNY seeks to recover from Navillus as back-charges; that CNY incurred approximately $3,673,144 in actual damages caused by Navillus's alleged delays (or that, alternatively, CNY is owed unpaid "General Conditions Fee and Insurance" on the Project, Navillus's portion of which is about $896,229); and that CNY is entitled to recover $940,000 in liquidated damages caused by Navillus's alleged delays on behalf of 20 TSQ. [ECF No. 106-23 at 2–3].

B.      The Adversary Proceeding

On December 21, 2017, Navillus filed this adversary proceeding against CNY. [ECF No. 1]. According to the currently operative version of the Complaint, Navillus is suing CNY for (i) breach of the Contract by virtue of CNY's alleged nonpayment of the Unpaid Total; (ii) quantum meruit (unjust enrichment) by virtue of CNY's alleged disapproval of—and nonpayment for—certain Extra Work which Navillus allegedly completed; (iii) quantum meruit (unjust enrichment) for the amounts just described in points (i) and (ii); and (iv) violation of the PPA by virtue of CNY's alleged nonpayment for the Submitted Unpaid Applications. [ECF No. 106-9 at 5–8]. The Motion concerns only the claims for breach of contract and violation of the PPA.

In its Answer, CNY asserts various defenses, including that (i) "Navillus failed to discharge its obligations under the Trade Contract with CNY, resulting in significant back-charges that are a setoff against the amount requested by Navillus," (ii) "Navillus failed to perform its contractual obligations and otherwise breached the Trade Contract, and consequently, this action is barred"; (iii) "Navillus' claims are barred in whole or in part by setoff and/or recoupment"; (iv) "Navillus

has not sustained any damage or loss as a result of any wrongful act or breach of the Trade Contract committed by CNY"; (v) "Navillus' claims are barred because any and all duties and obligations owed by CNY have been discharged"; and (vi) "Navillus performed its work negligently." [ECF No. 106-10 at 7–9]. Additionally, CNY has filed counterclaims against Navillus, including for breach of the Contract by virtue of Navillus's alleged failure to perform its obligations thereunder. [*Id.* at 18]. According to CNY, "[a]s a result of Navillus' failures, CNY has incurred and will continue to incur damages, both consequential and compensatory, and remains exposed to third parties, for damages which are the responsibility of Navillus. All such damages and resulting costs and expenses are recoverable from Navillus under the Trade Contract, in the form of back-charges and otherwise." [*Id.*]. Thus, CNY seeks damages that include, *inter alia*, "actual compensatory and consequential damages, delay/extended performance-related damages, [and] liquidated damages." [*Id.* at 23]. These include $1,788,245 of disputed back-charges, which, as the parties agree, must be tried [*e.g.*, Hearing Tr. at 9:8–20; ECF No. 107 at 6], and alleged delay damages of $4,613,144 ($3,673,144 of actual delay damages on CNY's own behalf plus $940,000 of liquidated delay damages on 20 TSQ's behalf) [ECF No. 106-23 at 2–3], which Navillus seeks to dismiss or, failing that, cap at $1,000,000. [ECF No. 108 at 11–23].

     C.    The Motion

On March 23, 2023, Navillus filed the present Motion [ECF No. 105], along with a Brief in Support thereof [ECF No. 108] (the "**Opening Brief**"), an affidavit signed by Navillus's project manager for the Project, Olan Kenneally [ECF No. 107], a Statement of Material Facts pursuant to Local Bankruptcy Rule 7056-1 [ECF Nos. 109], and an attorney declaration attaching 39 exhibits [ECF Nos. 106 to 106-56]. On March 24, 2023, CNY filed a letter stating that it would not cross-move for summary judgment. [ECF No. 110]. On April 28, 2023, CNY filed its Brief in Opposition to the Motion [ECF No. 113] (the "**Opposition Brief**"), along with a response to

Navillus's Statement of Material Facts [ECF No. 116] and affidavits signed by Robert Benziger [ECF No. 114] (the "**Benziger Affidavit**") and Jack Mesagno [ECF No. 115]. Mr. Benziger and Mr. Mesagno are, respectively, current and former CNY Project Executives. On May 15, 2023, Navillus filed its Brief in Further Support of the Motion (the "**Reply Brief**") [ECF No. 117], along with another attorney declaration attaching fifteen more exhibits [ECF Nos. 118 to 118-15]. On June 13, 2023, the Court held a hearing on the Motion (the "**Hearing**").[5]

During the Hearing, CNY asserted without having raised the issue in briefing that the Court lacked subject matter jurisdiction and should therefore dismiss the case. [Hearing Tr. at 43:13–46:12]. The Court directed CNY to analyze the jurisdictional issue and either submit a proposed joint scheduling order providing for an anticipated motion to dismiss the case or for other relief, or, in the alternative, inform the Court that CNY had concluded that the Court has jurisdiction after all. [Hearing Tr. at 85:3–86:19, 89:4–92:2; ECF No. 122 at 1]. On July 7, 2023, CNY filed a letter (dated July 10) concluding that the Court does have jurisdiction over this proceeding. [ECF No. 123]. On July 13, 2023, Navillus filed a responsive letter agreeing that the Court has jurisdiction. [ECF No. 125]. The same day, the Court entered a Memorandum Endorsed Order stating that the Court considered the Motion to be fully submitted and would decide the Motion in due course. [ECF No. 126].

## DISCUSSION

II. <u>Legal Standards</u>

A. <u>Summary Judgment</u>

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure ("**Civil Rule**") 56 applicable in adversary proceedings. Fed. R. Bankr. P. 7056. Civil Rule 56, in turn,

---

[5] Transcripts of hearings typically appear on the ECF docket after they are ordered, but, as of the time of this Decision, the Hearing transcript does not yet appear on the docket. The Court anticipates that the transcript will appear on the docket soon.

provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a); *see also, e.g.*, *Fleetwood Servs., LLC v. Richmond Cap. Grp. LLC*, No. 22-1885-CV, 2023 WL 3882697, at *1 (2d Cir. June 8, 2023) ("Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'") (quoting Fed R. Civ. P. 56(a)); *Cuello v. Target Corp.*, No. 22 CIV. 2013, 2023 WL 4763234, at *3 (S.D.N.Y. July 26, 2023) (same). "A dispute about a material fact is '"genuine" . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' Whether a fact is material depends on the governing substantive law—'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Cuello*, 2023 WL 4763234, at *3 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (alterations in original).

On a motion for summary judgment, "'[t]he movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."'" *Fleetwood Servs.*, 2023 WL 3882697, at *1 (quoting *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 103 (2d Cir. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))) (second alteration in original). However, "[o]nce the movant has 'demonstrat[ed] the absence of a genuine issue of material fact . . . the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.[']" *Pennington v. D'Ippolito*, 855 F. App'x 779, 781 (2d Cir. 2021) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (second and third alterations in original). Rule 56 provides that "[a] party asserting that a fact cannot be or is genuinely disputed must

support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also, e.g.*, *Pennington*, 855 F. App'x at 781–82 (same).

Thus, "[t]he non-moving party 'may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment,'" *Cuello*, 2023 WL 4763234, at *3 (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)), but "may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial," *Ampong v. Costco Wholesale Corp.*, No. 21-CV-02049, 2023 WL 4744185, at *2 (S.D.N.Y. July 25, 2023) (citing Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)); *see also, e.g.*, *Lawrence* v. *NYC Med. Prac., P.C.*, No. 1:18-CV-8649, 2023 WL 4706126, at *4 (S.D.N.Y. July 21, 2023) ("To defeat a motion for summary judgment, the non-movant 'must come forward with specific facts showing that there is a genuine issue for trial.'") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, "[i]n deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, No. 12-13689, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita*, 475 U.S. at 587); *see also, e.g.*, *Cuello*, 2023 WL 4763234, at *3 (same) (citing *Holcomb*, 521 F.3d at 137; *Anderson*, 477 U.S. at 255). Additionally, although "[t]he court need consider only the [parties'] cited materials," the court "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

"If the court does not grant all the relief requested by the motion, it may enter an order

stating any material fact—including an item of damages or other relief—that is not genuinely in

dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g); *see also, e.g.*, *In re:*

*Residential Cap., LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (noting that a court may "grant

some but not all of the relief requested in a summary judgment motion if it finds disputed issues

of fact as to some of the issues presented") (citing Fed. R. Civ. P. 56(g)).  Further, the Court may

"grant summary judgment for a nonmovant" or "on grounds not raised by a party," or "consider

summary judgment on its own."  Fed. R. Civ. P. 56(f).

        B.    <u>Choice of Law</u>

A court "need not undertake a choice of law analysis *sua sponte* where parties apply the

law of one state and do not dispute application of that state's law."  *120 Greenwich Dev. Assocs.,*

*L.L.C. v. Admiral Indem. Co.*, No. 08 CIV. 6491, 2013 WL 12331487, at *5 n.4 (S.D.N.Y. Sept.

25, 2013) (citing *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir. 1986)).  Here, the parties

have applied the law of only one state, New York [*see generally* ECF Nos. 108, 113, 117], and

when asked during the Hearing, counsel for both parties agreed that New York law governs the

issues in this New York-centered dispute [Hearing Tr. at 82:1–8].  Thus, the Court will apply New

York law without undertaking a choice of law analysis.

## III.    Navillus Is Not Entitled to Summary Judgment on Its Breach of Contract Claim

Navillus moves for summary judgment on its breach of contract claim.  Under New York

Law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by

the plaintiff, (3) breach by the defendant, and (4) damages.  *Anhui Konka Green Lighting Co. v.*

*Green Logic LED Elec. Supply, Inc.*, 625 F. Supp. 3d 269, 279 (S.D.N.Y. 2022) (citing *Diesel*

*Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011)).  "A party will not

be able to prevail on its breach of contract claim unless it . . . proves, by a preponderance of the

evidence, that it performed its own obligations under the contract." *Innovative Biodefense, Inc. v. VSP Techs., Inc.*, 176 F. Supp. 3d 305, 317 (S.D.N.Y. 2016) (quotation marks and citation omitted).  "The measure of whether a party has adequately performed under a contract is substantial performance." *Express Freight Sys. Inc. v. YMB Enters. Inc.*, 623 F. Supp. 3d 39, 54 (E.D.N.Y. 2022).

Navillus and CNY do not dispute that an agreement existed between them.  Nor do they dispute that CNY has not paid the Unpaid Applications, or that Navillus suffered financial loss, or damages, from that nonpayment.  Rather, at issue here is whether Navillus performed its obligations under the Contract.

"A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." *Bear, Stearns Funding, Inc. v. Interface Grp.–Nev., Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005).  The question of whether a party materially breached a contract is synonymous with whether that party "has substantially failed to perform its side of the bargain." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007).  Thus, "[i]f a party 'has substantially failed to perform its side of the bargain . . . ,' then the other party may be excused from its breach or nonperformance." *Body Glove IP Holdings, LP v. Exist, Inc.*, No. 1:21-CV-01181, 2023 WL 3568955, at *7 (S.D.N.Y. May 17, 2023) (quoting *Merrill Lynch*, 500 F.3d at 186).

"Substantial performance is performance, the deviations permitted being minor, unimportant, inadvertent, and unintentional." *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 311 (2d Cir. 2016) (citations omitted).  Several fact intensive factors bear on whether a party has substantially performed, including "the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent

to which the aggrieved party has already received the substantial benefit of the performance."
*Innovative Biodefense*, 176 F. Supp. 3d at 317 (citation omitted). Thus, "[t]he issue of whether a
party has substantially performed is usually a question of fact and should be decided as a matter
of law only where the inferences are certain." *Merrill Lynch*, 500 F.3dat 186.

For Navillus "to prevail on its motion for summary judgment with respect to its breach of
contract claim, 'it must be clear at the outset that there are no genuine issues of material fact that
either [Navillus] did not breach an agreement, or if it did, that its breach does not rise to the
appropriate level of materiality to justify termination of the agreement.'" *Body Glove*, 2023 WL
3568955, at *7 (quoting *Bear, Stearns.*, 361 F. Supp. 2d at 291). The Court therefore considers
whether there is a material dispute of fact concerning whether Navillus substantially performed
under the Contract, or whether it materially breached, as CNY contends.

Here there are material disputes of fact as to Navillus's performance that preclude an award
of summary judgment in Navillus's favor.

Navillus argues that its documentary evidence establishes that Navillus performed its
obligations under the Contract, meaning Navillus is legally entitled to the Unpaid Total (subject to
any disputed back-charges to be proved at trial), and CNY breached by not paying it. [*See* ECF
No. 108 at 9]. In support of its Motion, however, Navillus provides no direct evidence of the
quality of its Work. Rather, Navillus argues that its "burden of proof is met by the submission of
the parties' agreement [the Contract] and unpaid invoices [the Unpaid Applications]." [ECF No.
117 at 2]. CNY disputes that it approved the Work listed in the Unpaid Applications and contends
that Navillus's Work was of such a deficient quality that it could not have been approved under
the Contract or at common law. [*See, e.g.*, ECF No. 113 at 6–15].

Navillus's Unpaid Applications are clearly certified by Navillus itself, yet there is no
indication on the face of the applications that CNY approved them. [*See* ECF No. 106-13 to 106-

12

19].  Navillus's only proffered evidence of approval by CNY is the affidavit of Navillus project manager Olan Kenneally, who explained that "[e]ach month, [Navillus] would first submit a 'pencil requisition' and then discuss any billing issues raised by CNY.  After [Navillus] reached agreement with CNY on all billing line items, [Navillus] would certify the finalized application for payment requisition, which would then be sent to CNY's accountant for payment."  [ECF No. 107 at 3].  Navillus appears to suggest that the Navillus-certified Unpaid Applications alone are proof that CNY approved the Work described therein, whether because CNY forwarded them on to the Owners, because CNY failed to dispute them with Navillus in real time, or because, in one instance, CNY attempted to pay Navillus with a check that ultimately bounced.  This contention is not otherwise supported by the record:  for example, Navillus points to no evidence that CNY had an established practice of approving Navillus-certified payment applications by failing to object or by submitting them to the Owners, and the Court is aware of no Contract term providing for such approval.

Navillus also cites various cases for the proposition that submission of a signed contract and unpaid invoices constitute prima facie evidence of breach of contract which shifts the burden to the defendant to show a triable dispute exists.  [ECF No. 108 at 8].  Each of these cases, however, is distinguishable from the present case.  *See Digesare Mech., Inc. v. U.W. Marx, Inc.*, 176 A.D.3d 1449, 1451 & n.1, 1455, 112 N.Y.S.3d 306 (3d Dep't 2019) (holding summary judgment should have been granted because the subject contract expressly required the contractor to provide "written notice" of any disapproval of a payment application, and because the defendant had made "no showing that the contract's written notice provisions were complied with"); *George S. May Int'l Co. v. Thirsty Moose, Inc.*, 19 A.D.3d 721, 722, 796 N.Y.S.2d 196 (3d Dep't 2005) (affirming summary judgment because the plaintiff's invoices, which "were signed and accepted by defendant's president without objection," "reflect[ed] that defendant failed to pay *for services that*

13

*plaintiff provided*") (emphasis added); *Convenient Med. Care, P.C. v. Med. Bus. Assocs., Inc.*, 291 A.D.2d 617, 617, 737 N.Y.S.2d 403 (3d Dep't 2002) (noting that it was "undisputed that prior to the termination of the contract, plaintiff had not voiced an objection to the invoices it received"); *In re Stone Cast, Inc.*, No. 11-1045-1, 2014 WL 6435717, at *4 (Bankr. S.D.N.Y. Nov. 17, 2014) (deciding breach of contract claim following trial, not on a motion for summary judgment); *At&T Corp. v. Publ'g Concepts L.P.*, No. 08 Civ. 7658, 2010 U.S. Dist. LEXIS 32871, at *5, *9 (S.D.N.Y. Mar. 29, 2010) (noting that defendant "acknowledges that it owes [plaintiff] some amount" and granting summary judgment because defendant's argument was based on plaintiff's failure to honor certain "oral promises" that were inadmissible in light of the subject contract's integration clause); *Ironwoods Troy, LLC v. Optigolf Troy*, LLC, 204 A.D.3d 1130, 1131, 166 N.Y.S.3d 730, 734 (3d Dep't 2022) (granting summary judgment based on the evidence tendered, which included, "as relevant" to the court, an affidavit, deposition testimony, the executed agreements, and a signed statement by the nonmovant accepting delivery of all assets as-is— submission of invoices or other unapproved payment applications was not at issue).

Here, by contrast, even if the submission of the Contract and the Unpaid Applications does establish a prima facie case of breach, CNY has met its shifted burden "to provide competent evidence raising a question of material fact." *In re Stone Cast*, 2014 WL 6435717, at *4 (quoting *At&T*, 2010 U.S. Dist. LEXIS 32871, at *8).

CNY argues that its satisfaction with Navillus's Work was a condition of the Contract and that triable issues of fact remain concerning whether Navillus's Work satisfied that condition. [ECF No. 113 at 12–13]. Under New York law, a contract may establish conditions precedent to performance "that affect a party's duty to render a promised performance." *Diffusion Fin. S.A.R.L. v. Smith*, No. 95 CIV. 2140, 1997 WL 272391, at *3 (S.D.N.Y. May 22, 1997). If the condition precedent does not occur and is not excused according to the express or implied terms of the

14

contract, the conditional duty is discharged. *See id.*; *see also Sidman v. Concord Arena Parking, LLC*, No. 15-CV-7426, 2023 WL 2552831, at *7 (E.D.N.Y. Mar. 17, 2023) ("Summary judgment should be granted in favor of a defendant accused of breach of contract where the defendant's contractual obligations were subject to an unsatisfied condition precedent."). "[W]hen contract duties are contingent upon a particular condition being 'satisfactory' to one party . . . that party's rejection of the condition is to be judged by an objective standard of reasonableness." *Blask v. Miller*, 186 A.D.2d 958, 960, 588 N.Y.S.2d 940, 942 (3d Dep't 1992) (citations omitted); *see Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D.2d 262, 269, 629 N.Y.S.2d 382, 386 (1st Dep't 1995) ("a party may not frustrate the performance of an agreement by bringing about the failure of a condition precedent").

Here, as CNY observes, the Contract expressly conditions CNY's obligation to pay Navillus on CNY's satisfaction with Navillus's Work. [*See, e.g.,* ECF No. 106-2 at ¶¶ 5.18 ("*Upon acceptance of [Navillus'] work by [CNY]* . . . [CNY] shall then forward [Navillus'] application for final payment") (emphasis added), 5.24 ("[CNY] expressly reserves the *right to withhold from [payment]* an amount sufficient in [CNY's judgment] to compensate it . . . where it has reason to believe that . . . [Navillus'] Work is defective or incomplete [or] [Navillus] has failed to perform as per the Contract") (emphasis added), 8.04 ("Should [Navillus] fail to properly remove and replace any rejected Work, [CNY] shall have the right to [remove and replace the work] and *the cost thereof . . . may be deducted from any payment or payments due or to become due to [Navillus]*") (emphasis added), 18.03 ("Should [Navillus] following written notice from [CNY] fail to correct, remove, replace and/or repair . . . defects and/or damages within the time required by [CNY] . . . [CNY] has the right to . . . correct defects . . . and [] *to deduct such costs from any payments due* [Navillus]")] (emphasis added). Similarly, Section 8.01 of the Contract provides that "[CNY] shall have the authority *at all times* to inspect and reject Work and materials which

15

in any of their judgments do not conform to the Contract Documents."  [*Id.*] (emphasis added).
Moreover, under section 8.02, Navillus is "bound by the decision of . . . [CNY] as to quality of
Work . . . [and] performance of Work."  [*Id.*]   Indeed, according to sections 5.25 and 5.28,
respectively, the parties agreed that "[p]ayment to [Navillus] . . . is specifically agreed not to
constitute or imply acceptance [by CNY] . . . of any portion of [Navillus's] Work," and, similarly,
that "[n]o payment made hereunder shall . . . constitute acceptance by [CNY] of any element of
the Work. . . ."  [*Id.*].

Thus, Navillus's contentions are refuted and the case law Navillus cites distinguishable
because CNY was entitled to inspect and reject Navillus's Work "at all times" and Navillus had
expressly agreed that payment of a payment application would *not* constitute approval of the paid-
for Work.  Unlike in *Digesare* (relied upon by Navillus), there is no Contract provision requiring
that CNY "shall provide written notice to" Navillus "[u]pon the partial or entire disapproval by
[CNY] of [Navillus's] application for payment," *Digesare Mech.*, 176 A.D.3d at 1451 n.1, and
Navillus points to no Contract provision requiring any specified form or timing of notice of
perceived deficient performance.

CNY also points to sufficient evidence to establish additional triable disputes about the
sufficiency of Navillus's performance, such as whether CNY rejected the Work and/or the Unpaid
Applications, and whether CNY notified Navillus of any such rejections (even assuming such
notice was required).  For example, Navillus itself has filed as an exhibit an excerpt of CNY's
expert report that summarizes Navillus's apparent delays [ECF No. 106-24], and according to
CNY "there are more specific findings in the rest of the expert report" regarding delays allegedly
caused by Navillus's deficient Work—specifically, "concrete sagging" [Hearing Tr. at 63:11–21].
Similarly, the Benziger Affidavit details various defects in Navillus's Work and indicates that
"[o]n numerous occasions, Navillus was notified that its work proceeded slowly and that its

defective work was causing project delays." [ECF 114 at 3]. And according to another of Navillus's exhibits—a November 20, 2017 email chain between Navillus and CNY—Navillus was aware that CNY's refusal to reissue the previously bounced check was because of "a potential back charge ($800K)." [ECF No. 106-20 at 2 of 2]. Even if CNY bears the burden as to Navillus's performance, all of this evidence clearly presents a triable issue of fact that precludes summary judgment.

In fact, Navillus even acknowledges as much. Navillus concedes that CNY's interest in certain back-charges is "disputed" and must be "proven against Navillus at trial." [*See* ECF 108 at 1, 7; ECF No. 107 at 3 (Navillus's project manager conceding same)]. Because back-charges accrue when Navillus fails to adequately perform, a dispute of fact over back-charges equates to a dispute of fact over Navillus's performance sufficient to defeat summary judgment. At a minimum, the issues appear so intertwined that the resolution of one without the other would be inefficient, and for that reason alone the Court would exercise its discretion to deny summary judgment even in the absence of the material fact disputes. *See Toyoshima Corp. of Cali. v. Gen. Footwear, Inc.*, 88 F.R.D. 559, 560 (S.D.N.Y. 1980) (quoting *Fine v. City of New York*, 71 F.R.D. 374, 375 (S.D.N.Y. 1976)) ("Even where the summary judgment criteria appear to be satisfied . . . 'the Court may deny summary judgment as a matter of discretion' [including] where a part of the matter which is ripe for summary judgment is intertwined with additional claims that must be decided at trial."); *see also Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Tr.*, No. 08-CV-6227, 2015 WL 1924924, at *14 (W.D.N.Y. Apr. 28, 2015) (quoting 11 Moore's Federal Practice, § 56.41[3][d]) ("The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it, if, in the court's opinion, the case would benefit from a full hearing.").

17

Navillus's Motion for summary judgment on its breach of contract claim is therefore denied.

## IV.    Navillus Is Not Entitled to Summary Judgment on Its Prompt Payment Act Claim

Navillus is not entitled to summary judgment on its PPA claim.  Moreover, to the extent that Navillus seeks damages on that claim beyond its requested recovery of statutory prejudgment interest, the Court *sua sponte* holds that such damages are not available under the PPA and grants partial summary judgment in favor of CNY on that limited issue.

### A.    Navillus's Request for Summary Judgment on Its PPA Claim Is Denied

Navillus argues that it "is entitled to recovery on its Fourth Cause of Action . . . in the amount of the non-payment plus interest at the statutory rate of 1% percent [sic] a month of the underpayments [sic] pursuant to § 756-b(1)(b) of the PPA."  [ECF No. 108 at 10].  According to Navillus, "[p]ursuant to PPA § 756-a(b)(ii),[6] CNY was required to pay Navillus' payment applications within 7 days after receipt of payment from the owner.  . . .  CNY failed to pay Navillus' payment applications within the 30 days[7] required under the PPA, and as CNY never provided Navillus with any written communication explaining why payments were being withheld, under § 756-a, the invoices were required to be paid in full."  [*Id.* at 9–10].

The plain language of the PPA forecloses Navillus's request for summary judgment on this basis.  Section 756-b(1)(b) of the PPA provides that "[n]otwithstanding any contrary agreement, if any interim or final payment to a subcontractor is delayed beyond the due date established in paragraph (b) of subdivision three of section seven hundred fifty-six-a of this article [i.e., Section

---

[6] Navillus repeatedly refers to "PPA § 756-a(b)(ii)," which does not exist.  Context makes clear, however, that Navillus intended to refer to PPA § 756-a**(3)**(b)(ii), which is the provision governing payments from contractors to subcontractors.

[7] As Navillus itself notes just a few lines earlier, PPA § 756-a(3)(b)(ii) refers to a time limit of "seven days," not "30 days."  The only reference to a 30-day time limit in the PPA appears in Section 756-a(3)(a)(iii), which governs payments from *owners* to *contractors* (not from contractors to subcontractors), and is thus inapplicable here.

756-a(3)(b),] the contractor or subcontractor shall pay its subcontractor interest, beginning on the

next day, at the rate of one percent a month or fraction of a month on the unpaid balance, or at a

higher rate consistent with the construction contract." N.Y. Gen. Bus. Law § 756-b(1)(b).

Therefore, Navillus is entitled to relief under Section 756-b(1)(b) only if CNY violated Section

756-a(3)(b), which provides, in relevant part, as follows:

> The contractor or subcontractor's payment of subcontractor or material supplier's
> interim or final invoice *shall be made on the basis of a duly approved invoice of the*
> *work performed* and materials supplied during the billing cycle.
>
> . . .
>
> (ii) *When a subcontractor has performed in accordance with the provisions of its*
> *construction contract*, the contractor shall pay to the subcontractor, and each
> subcontractor shall in turn pay to its subcontractors, the full or proportionate
> amount of funds received from the owner for each subcontractor's work and
> materials based on work or services provided under the construction contract, seven
> days after receipt of good funds for each interim or final payment, provided all
> contractually required documentation and waivers are received.

N.Y. Gen. Bus. Law § 756-a(3)(b)(ii) (emphasis added). Thus, by the very terms of the PPA, any

violation of Section 756-a(3)(b)(ii) is necessarily premised on both (a) the contractor's approval

of an invoice, and (b) the subcontractor's performance in accordance with the provisions of the

contract.

As discussed above, there exist several genuine issues of material fact regarding both (a)

whether CNY approved Navillus's Unpaid Applications, and (b) whether Navillus performed in

accordance with the provisions of the Contract. *See supra* § III. Thus, Navillus has not shown

that it is entitled to summary judgment declaring that CNY has violated PPA § 756-a(3)(b)(ii), or

that Navillus is entitled to relief under PPA § 756-b(1)(b).

This outcome is not changed by Navillus's observation that "[r]egarding CNY's non-

payment of Navillus' pay application #20 in the amount of $700,022.91, CNY testified that 701

Seventh never disapproved CNY's invoicing of the Navillus payment, yet the owner failed to

provide funds for such invoice.  The Owner, 701 Seventh, was required under the PPA to approve or disapprove CNY's invoice within 12 business days and issue a written statement describing the items that are not approved."  [ECF No. 108 at 9–10].  This argument appears to be directed at the Original Owner, but considering the Original Owner is not a party to this dispute, the argument's intended significance is unclear.  Even construing Navillus to be arguing that a breach by the Original Owner of its duties to CNY results in a derivative breach by CNY as to Navillus, (i) Navillus cites no support for that argument (and the Court is aware of none), and (ii) summary judgment is still foreclosed by the factual disputes discussed in the preceding paragraph.

Similarly, beyond the language of the Contract discussed above, the PPA itself refutes Navillus's complaint that "CNY never provided Navillus with any written communication explaining why payments were being withheld, [such that,] under § 756-a, the invoices were required to be paid in full" [*id.*]—in other words, that the *failure to provide a written communication* (as opposed to the failure to timely pay) triggered an obligation to pay in full. According to PPA § 756-b(2)(b)(i)(D), the remedy for "a contractor or subcontractor fail[ing] to approve or disapprove a subcontractor's invoice within the time limits established in paragraph (b) of subdivision three of section seven hundred-fifty-six-a [i.e., Section 756-a(3)(b)]" is not full payment of the invoice, but, instead, that the "subcontractor may suspend contractually required performance . . . [but] only after providing written notice and an opportunity to cure consistent with subparagraph (ii) of this paragraph."  N.Y. Gen. Bus. Law § 756-b(2)(b).  By Navillus's own account, it did not avail itself of this remedy, even though it knew it was entitled to suspend performance of the Contract.  [*See, e.g.*, ECF No. 108 at 6 ("Despite the unexcused failure of CNY to make payments of approved applications, which entitled Navillus to suspend performance, Navillus continued in good faith to perform the Subcontract work.")].

Moreover, the PPA is not as robust as Navillus suggests. As one court has explained, "[d]espite the [PPA's] strict language, New York courts have sharply limited its effect. For example, in a Second Department case, . . . a defendant that did not respond to an invoice within the allotted twelve days was able to present evidence that the invoiced amount was 'subject to various deductions for, inter alia, back charges, incorrect invoicing, and improper performance of the work.' The defendant's failure to issue a written disapproval on the invoices did not bar it from asserting defenses." *Layout, Inc. v. Heavy Metal Corp.*, No. 16-CV-2531, 2018 WL 2244684, at *3 (E.D.N.Y. Apr. 17, 2018) (quoting *Donninger Constr., Inc. v. C.W. Brown, Inc.*, 979 N.Y.S.2d 133, 135 (2d Dep't 2014)). Therefore, summary judgment is not warranted even if CNY did not respond to the Unpaid Applications as required by the PPA.

Accordingly, Navillus's Motion for summary judgment on its PPA claim is denied.

### B.    CNY's Informal Request for Dismissal of the PPA Claim Is Denied

In its Opposition Brief, CNY argues that, in *Layout*, the Eastern District "dismissed the Prompt Payment Act claim on its own motion because '[t]he act has no effect on the claims and defenses available on the underlying breach of contract claim . . . and will serve to confuse the jury if presented as a claim separate from the underlying breach of contract [claim]." [ECF No. 113 at 20 (alterations in original) (quoting *Layout*, 2018 WL 2244684, at *5)]. CNY urges this Court to "follow the *Layout* Court and dismiss the Prompt Payment Act claim as duplicative of the contested breach of contract claim." [*Id.*]. The Court declines to do so.

*Layout* determined that "[b]efore, during, and after the period when Layout invoiced Metal, the parties exchanged emails about serious errors and met with one another, in effect acknowledging that Metal complained in detail about Layout's work. As a matter of law, this satisfies the written notice requirement of the Act as it has been construed by the New York courts. These writings and meetings put Layout on notice that its bills were disputed and why." *Layout*,

21

2018 WL 2244684, at *5.  In light of those findings, the court dismissed the PPA claim because "[t]he statute ha[d] no application to the dispute, *and* [would] serve to confuse the jury."  *Id.*

Here, it is not clear that CNY has satisfied the requirements of the PPA, so summary judgment dismissing the PPA claim would be just as inappropriate as summary judgment in favor of Navillus on the PPA claim.  This is especially so considering that CNY not only did not file a cross-motion for summary judgment seeking such relief, but affirmatively filed a letter with the Court indicating that it would *not* cross-move for summary judgment.  [ECF No. 110].  Thus, CNY's informal request for dismissal of the PPA claim is denied.  As the Court noted during the Hearing, any concerns about confusion at trial may be addressed through a motion in limine or other pre-trial motion.  [Hearing Tr. at 59:6–13].

C.    The Court *Sua Sponte* Grants Summary Judgment Limiting Any Damages Under Navillus's PPA Claim to Statutory Interest

Although the Court declines CNY's invitation to dismiss the PPA claim, the Court does hold, on its own motion, that any damages recovered on the PPA claim are limited to statutory interest provided for by the PPA.

As noted above, Navillus argues that it "is entitled to recovery on its Fourth Cause of Action . . . *in the amount of the non-payment plus* interest at the statutory rate of 1% percent [sic] a month of the underpayments [sic] pursuant to § 756-b(1)(b) of the PPA."  [ECF No. 108 at 10] (emphasis added).  Taken literally, then, Navillus's PPA claim seeks both the Unpaid Total, and statutory interest of 1%.  Elsewhere, Navillus's submissions suggest it may not be seeking the Unpaid Total on its PPA claim.  For example, Navillus's Reply Brief regarding the PPA says only that "Navillus is entitled to interest of 1% per month on its open invoices, under the Prompt Payment Act," [ECF No. 117 at 8], and during the Hearing, Navillus never challenged the

argument of counsel for CNY that the "Prompt Payment Act is really just a calculation of interest that may arise at post-trial" [Hearing Tr. at 58:20–24].

For the avoidance of doubt, the Court holds the only PPA remedy that may be available here is the interest award that the statute requires in certain circumstances. PPA § 756-b(1)(b) provides only for "interest, beginning on the next day, at the rate of one percent a month or fraction of a month on the unpaid balance, or at a higher rate consistent with the construction contract." N.Y. Gen. Bus. Law § 756-b(1)(b). Neither this provision—which is the only PPA remedy provision invoked by Navillus—nor any other provision of the PPA that the Court has identified provides for recovery of the total amount invoiced. Indeed, courts have characterized the PPA as providing only three remedies, depending on the violation: (i) statutory interest; (ii) suspension of performance under the contract; and (iii) referral of the matter to the American Arbitration Association. *See, e.g.*, *Layout*, 2018 WL 2244684, at *3; *Bank of Am., N.A. v. ASD Gem Realty LLC*, 205 A.D.3d 1, 10, 164 N.Y.S.3d 566 (1st Dep't 2022).

Thus, the Court *sua sponte* grants summary judgment limiting any recovery on Navillus's PPA claim to statutory interest, if Navillus establishes entitlement to such an award at trial.

## V.    Navillus Is Not Entitled to Summary Judgment on CNY's Delay Damages Counterclaims

Navillus argues that it is entitled to summary judgment dismissing CNY's counterclaims to the extent they seek delay damages—whether on CNY's own behalf or on behalf of 20 TSQ— on the grounds that (i) there is no contractual basis for CNY's recovery of delay damages from Navillus, and (ii) neither CNY nor 20 TSQ has incurred any damages resulting from any alleged delays. [ECF No. 108 at 11–22]. For the reasons discussed below, the Court concludes triable disputes of fact exist as to both of these two points, precluding summary judgment.

### A.    <u>Navillus Fails to Establish That There Is No Contractual Basis for CNY's Recovery of Delay Damages</u>

Navillus argues there is no contractual basis for CNY's recovery of delay damages from Navillus for three reasons:  first, on the theory that Section 3.02 of the Contract—which, according to Navillus, is "convoluted," "ambiguous," and the only possible contractual basis for recovery of delay damages—had been rendered "obsolete" by the time Navillus started its Work; second, on the ground that the 94-day delay alleged by CNY is not based on Section 3.02; and third, that CNY assertedly waived any reliance on the Contract's "time-of-the-essence" provisions by allowing Navillus to continue working and failing to notify Navillus of its having caused delays to substantial completion.  [ECF No. 108 at 12–14].

CNY responds that (i) Navillus's contention that the delay damages provision is "ambiguous" is fatal to its Motion because it establishes the existence of a triable dispute regarding the Contract's meaning; (ii) issues of fact exist regarding CNY's claim that Navillus caused 94 days of unexcused delay; (iii) earlier Project delays did not make the Contract's time-of-the-essence provision inapplicable to Navillus; and (iv) the Contract did not require contemporaneous notice of delay.  [ECF No. 113 at 21–25].

The Court concludes that Navillus has not shown the absence of a genuine issue of material fact regarding possible delay damages under the Contract.

First, as Navillus acknowledges, Section 3.02 is ambiguous.  That ambiguity precludes summary judgment here for claims under that provision.  "[A] motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  "If the language is susceptible to different reasonable interpretations . . . , then the contract's meaning becomes an issue of fact precluding summary judgment." *Burke v. Ulico Cas. Co.*, 165 F. App'x 125, 127 (2d Cir. 2006)

(quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094

(2d Cir. 1993)); *see Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011)

("[W]here language in a contract is ambiguous, summary judgment can be granted 'if the non-

moving party fails to point to any relevant extrinsic evidence supporting that party's

interpretation of the language.'") (quoting *Compagnie Financiere de CIC et de L'Union*

*Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)).

Thus, as is true here, if Section 3.02 is "ambiguous" and susceptible to more than one reading,

summary judgment is inappropriate.

Section 3.02 reads, in relevant part, as follows:

3.02 Liquidated Damages

3.02.1 Trade Contractor acknowledges that its failure to progress the Work in
accordance with the Project Schedule and the Schedule and durations shown in its
Scope of Work will result in extreme hardship to Contractor and Owner and will
irreparably interfere with Contractor's and Owner's obligations and commitments.

3.02.2 Accordingly, the parties hereby stipulate and agree that if Trade Contractor
shall fail to prosecute and complete its Work in accordance with the Project
Schedule and the Trade Contractor Schedule and fixed durations of time shown in
the Exhibit B Scope of Work including any milestone or Trade Contractor
substantial completion date, or to sufficiently progress the Work and maintain the
progress of the Project so that Other Trade Contractors, subcontractors and others
at the project may fully complete their work without acceleration to allow a
Temporary Certificate of Occupancy to be issued and the Project to achieve
Substantial, Completion no later than March 31, 2017, then Contractor can recover
its actual damages from Trade Contractor and for the benefit of Owner, liquidated
damages in the amount of Ten Thousand Dollars ($10,000) per day for each
calendar day of delay beyond that agreed to total days of Work in the Trade
Contractor's Schedule in Exhibit B until substantial completion and its Work is
completed and accepted by Owner and Contractor. Trade Contractor acknowledges
that the liquidated damages that may be assessed against it are reasonable under the
circumstances. Owner is a third party beneficiary of this provision and may seek
recovery of said liquidated damages directly against Trade Contractor. Liquidated
damages and/or actual damages as a result of Trade Contractor's delays shall be
capped at one million dollars ($1,000,000).

[ECF No. 106-1 at 4–5 of 78].

Navillus itself asserts that Section 3.02 is "convoluted and ambiguous" [ECF No. 108 at 12], and when asked during the Hearing whether, "if there's an ambiguous term with competing possible interpretations, then you have a trial as to the appropriate meaning; yes?", Navillus responded, "Yes." [Hearing Tr. at 36:1–5]. Navillus argues, however, that it is nonetheless entitled to summary judgment because CNY "fails to provide an unambiguous interpretation of the Trade Contract that would sustain its burden." [ECF No. 117 at 9]. But Navillus is simply wrong. CNY contends that, where the start date of Navillus's Work was delayed by earlier Project delays, the Contract's timeliness requirement for Navillus nevertheless survives and requires timely completion of Navillus's Work. This is, at a minimum, a plausible reading of Section 3.02.

This reality undermines Navillus's position, which appears to be that, despite its acknowledgment that Section 3.02 is "convoluted and ambiguous," the only reasonable reading of it is that, if Navillus itself deviated from the amount of time set forth for its Work in the Project Schedule and Trade Contract Schedule, thus delaying Substantial Completion of the Project beyond March 31, 2017, then Navillus would be liable for delay damages for each such day of delay. [ECF No. 108 at 12–13]. Under this reading, because previous delays already made the Project Schedule unrealizable before Navillus began its Work, Section 3.02 was void or unenforceable as to Navillus by the time it started working on the Project. [*Id.* at 14].

Navillus's reading may be viable, but Navillus has not shown that it is the *only* way to interpret Section 3.02, nor that CNY's competing interpretation is not also permissible. According to CNY, "Navillus agreed that, in the event of delays to the project which are outside Navillus's control, the stipulated remedy is an extension of the contractual project schedule." [ECF No. 113 at 23–24]. CNY reasons that "[b]ecause the Contract specifically states that Navillus is not responsible for project delay caused by others and is not being charged with any

26

days of delay caused by others, Navillus has already received the contractually stipulated remedy and is contractually responsible for all 94 days of project delay it concedes are its own fault." [*Id.* at 25]. In other words, under CNY's reading of Section 3.02, the references to the "Project Schedule" and the "Trade Contract Schedule" are flexible and may be adjusted as required, and if Navillus is responsible for additional delays to that adjusted schedule, then Navillus is liable for delay damages that it caused.

Finally on this issue, Navillus argues that even if CNY's reading of Section 3.02 is correct (or at least viable), Navillus is still entitled to summary judgment because CNY never provided Navillus an updated schedule. [Hearing Tr. at 33:10–17]. During the Hearing, however, when asked whether Navillus "ha[d] any law saying that a failure of a general contractor to provide a modified schedule precludes their asserting delay damages," Navillus responded, "I don't think it's a question of law providing that. It's a question of whether or not they can sustain their claim under this provision. This is the provision." [*Id.* at 33:18–25]. But Section 3.02 does not unambiguously require such notice. Thus, Navillus's argument merely presents yet another contractual ambiguity rendering summary judgment inappropriate—namely, whether CNY was contractually obligated to provide notice of any updated schedules caused by delays outside of Navillus's control, as well as whether the provision is as narrow and rigid as Navillus contends, or as flexible as CNY contends.

In sum, the parties' competing readings of Section 3.02 are each reasonable interpretations of the Contract, and, as a result, a trial is required and summary judgment is not appropriate on this issue.

This conclusion is not overcome by Navillus's other arguments. Navillus argues that CNY waived any reliance on contractual "time-of-the-essence" provisions by allowing Navillus to continue working without notifying Navillus of alleged delays. [ECF No. 108 at 14]. But this

27

argument presents factual disputes that cannot be resolved on summary judgment—such as, for example, whether CNY was under any obligation to notify Navillus of alleged delays [*Id.* at 14; ECF No. 113 at 25]; whether Navillus's argument is barred by the Contract's "no-waiver" provision [ECF No. 113 at 25–26]; and whether CNY waived its reliance on the "no-waiver" provision [ECF No. 117 at 10]. Moreover, it may be that CNY is not even relying on a "time-of-the-essence" provision, which appears in Section 3.01 of the Contract [ECF No. 106-1 at 4 of 78]. That section is never cited or referenced in CNY's counterclaims. [*See generally* ECF No. 106-10]. Finally, even assuming CNY is relying on a time-of-the-essence provision, the only case cited by Navillus in support of its waiver argument actually holds that allowing work to continue following a delay does *not* waive the ability to recover damages for those delays. *Schenectady Steel Co. v. Bruno Trimpoli Gen. Constr. Co.*, 43 A.D.2d 234, 237–38 (3d Dep't 1974), *aff'd* 34 N.Y.2d 939 (1974) ("By [permitting the contract to continue,] respondent at that time waived its right to cancel for an untimely performance . . . , *although it retained its right to seek damages for the delay*.") (emphasis added).

Thus, the Court denies the Motion to the extent it seeks to dismiss CNY's counterclaims seeking delay damages on contractual grounds.

B.    Navillus Fails to Establish That It Did Not Cause Any Delay Damages

Navillus also argues that it is entitled to summary judgment because (i) it "did not cause any delay to Project Completion," and (ii) even assuming Navillus did cause delays, "neither CNY nor the Owner incurred any damages proximately caused thereby." [ECF No. 108 at 15]. Neither argument presents a viable basis to award summary judgment.

First, fact issues exist as to whether Navillus delayed Project Completion. Indeed, just a few sentences before arguing that "Navillus' schedule expert BRG, examined CNY's schedule updates . . . and determined that Navillus caused no delays to the Project," Navillus notes that

28

"CNY's expert, Exponent, [] by comparing the August 12, 2014 GMC schedule to actual substantial completion, contends that the Project Completion was delayed by 490 days, 94 days of which are allocated to Navillus." [*Id.*]. A factual dispute could hardly be more starkly put.

Triable fact questions also exist as to whether CNY or the Owner suffered damages proximately caused by Navillus, notwithstanding Navillus's contentions.

As noted above, Section 3.02 of the Contract provides that "Contractor can recover its actual damages from Trade Contractor and for the benefit of Owner, liquidated damages in the amount of Ten Thousand Dollars ($10,000) per day for each calendar day of delay." [ECF No. 106-1 at 4–5 of 78]. Tracking this provision, CNY seeks actual damages on its own behalf and liquidated damages "on behalf of the Owner 20 TSQ as successor and assign of 701 Seventh." [ECF No. 106-23 at 2–3]. As to 20 TSQ's liquidated damages, CNY clams that it is entitled to $940,000 because "[l]iquidated damages are calculated at the rate [of] $10,000.00 per day for each day Navillus delayed completion of the project," and Navillus allegedly caused 94 days of delay. [*Id.*]. As to its own actual damages, CNY offers two alternative theories, both of which are based on CNY's operating costs—referred to as "General Conditions." [*Id.* at 3–4]. First, CNY seeks "actual delay damages" of $3,673,144, which CNY contends are "actual costs [] chargeable against Navillus as a 'Cost of the Work,'" and which was calculated by multiplying 94 days of alleged Navillus delays by a "Daily General Conditions rate" of $39,076 (which, in turn, was "determined by taking as a representative and typical baseline sample the General Conditions for [six] monthly Requisitions [spanning November 30, 2016 to August 31, 2018] and computing a Daily General Conditions rate based on those months"). [*Id.*]. Second, "[a]s an alternative to CNY's actual delay damages," CNY seeks $896,229.33 from Navillus on the basis that "Navillus caused 19% of the delay to the Project . . . , so Navillus is responsible for 19%" of the $4,716,996.50 "total of the unpaid General Conditions Fee and Insurance through Requisition 75 (period ending July 31,

2019)." [*Id.* at 4]. Navillus argues that it did not proximately cause CNY's damages under any of these theories, but factual questions preclude summary judgment on the issue.

*First*, Navillus argues that its alleged delays could not have proximately caused any of CNY's alleged actual delay damages because those damages are based on CNY's "General Conditions," and even though CNY has not been paid all of its General Conditions for the entire Project, CNY did "receive[] payment of its General Conditions costs" during "the period in which Navillus allegedly delayed the Project." [ECF No. 108 at 16–17]. This argument fails because it ignores the possibility that substantial delays may cause damages that are not fully realized until later on in the Project. CNY contends just that:

> [A]n analysis of delay damages first requires an analysis of the total project delay followed by an allocation of the total delay to the responsible parties. As of the date of the February 13, 2018 purchase and sale agreement [between the Original Owner and the Successor Owner (the "**PSA**")], work on the project was still proceeding and total project delay was still accruing. Moreover, as set forth in CNY's expert delay analysis, the final window period of project delay by Navillus was still accruing between September 27, 2017 through *November 13, 2018* (Nav. Ex. 22). It was thus impossible to even ascertain the length of project delay caused by Navillus at the time of the [PSA].

[ECF No. 113 at 32 (citing ECF No. 106-24)]. Navillus acknowledges this argument in its Reply Brief but responds that it "ignores CNY's Verified Second Supplemental Responses to Interrogatories stating that all of the delays attributed to Navillus had occurred by March 3, 2018, before the sale of the Project to 20 TSQ." [ECF No. 117 at 11–12 (citing ECF No. 106-23)]. This response misses CNY's point that, regardless of the calculated end date of Navillus's alleged delays, neither the total project delay, the total damages attributable to those delays, nor the portion of those damages allocable to Navillus could be calculated until all work on the Project—not just Navillus's—had concluded.

In further support of its argument, Navillus emphasizes that "[w]hen questioned during his deposition, CNY's Steve Colao did not deny that CNY received payment of its General Conditions

costs through August 2018 – the period in which Navillus allegedly delayed the Project." [ECF No. 108 at 17 (citing ECF No. 106-39)]. But Navillus ignores that, in the very same deposition excerpt (which Navillus itself filed as an exhibit), Mr. Colao explained that Navillus may have caused actual delay damages to CNY notwithstanding CNY's receipt of its General Conditions during the period of Navillus's alleged delays, because delays and delay damages must be viewed with respect to the Project as a whole, and CNY did not receive all of its General Conditions for the entire Project:

> [T]here's a delay. Therefore there's an extension of time. But during that time, yes, we're [CNY] billing your [Navillus's] GCs [General Conditions], but there's an extension of time for the schedule. So there are GCs that then had to cover that extension of time, and it's not necessarily that you look at it where but I paid you for April 4th, and now you're saying there's a delay on April 4th. It doesn't work that way. There's a delay—it looks like that way—there's an overall delay, so there's an extra 94 days to the schedule that at the end of the job somebody owes me those 94 days. And our position is Navillus owes that 94 days. You're trying to pinpoint that those 94 days were from this date to that date. That's used for our calculation to be fair that this was the time period it happened, but still an extra 94 days of general conditions of which I can take the position that I have not been paid for those 94 days because I'm still owed 5–, 6–, 7 million, whatever the number is of general conditions at the end of this project. So—and then 94 days doesn't necessarily capture that whole amount, so to the extent I'm still owed that whole. I would argue that I'm not paid those 94-day delays.
>
> . . .
>
> Q  Now, [the $3,673,144 in actual damages alleged on CNY's own behalf] consist of the payments that CNY received in the period of the 94 days of delay?
>
> A  I respectfully disagree. The difference is that we are calculating the amount using those periods. But the 94-day delay still exists and still needs to be covered.
>
> Q  It's not a question of—what I'm asking you is: Who has incurred the damages that are represented in that 3,674,144?
>
> A  It's a method of calculation to say that the 94 days—the 94 days of general conditions are the result of Navillus's delay, and it has a value of 3.67,144 [sic] and that we should be the beneficiary of that damage. . . . You still have to capture the 94-day delay. If—if—you know, today's if I was paid by the owner 100 percent GCs to the end of the job and I got captured inclusive of those the 94 days' delay,

then I think you would be right that I can't get it twice.  But—but—but—that's not
the case.

[ECF No. 106-39 at 175:5–177:18].   Whether Navillus's alleged delays caused CNY

damages after the alleged end date of those delays is a fact question for trial, not summary

judgment.

CNY also cites cases for the proposition that "[a]ny payments that CNY has received or

may receive from any party, including Ownership, does not serve as a credit against Navillus'

liability for damages it admittedly caused by reason of 94 days of unexcused project delay."  [ECF

No. 113 at 27 (citing *Isaacs v. Jefferson Tenants Corp.*, 270 A.D.2d 95, 704 N.Y.S.2d 71 (1st

Dep't 2000) ("[P]laintiff was not entitled to a credit against his [contractual] obligation [to pay the

defendant's legal costs] in the amount of the payment made to the [defendant] by its insurer.");

*Sch. Dist. of Niagara Falls v. CrossPointe, LLC*, No. 08-CV-020, 2012 WL 1144618, at *2

(W.D.N.Y. Apr. 4, 2012) ("[D]amages must be calculated based on the full amount that [Plaintiff]

paid [Defendant], regardless of the fact that some of those payments were later reimbursed by [a

third party]."); *ADM Inv. Servs., Inc. v. Collins*, 515 F.3d 753, 755 (7th Cir. 2008) ("That a third

party reimburses part of a loss does not disable the injured person from recovering under tort or

contract law.  . . .  How [Plaintiff] and [a third party] settle accounts between themselves is none

of [Defendant's] business."))].  Navillus responds that these cases "are distinguishable in that they

involve reimbursement of a loss by a third-party," whereas "CNY never incurred a loss because a

party to the project paid for its work."  [ECF No. 117 at 13].  This response fails because, like

Navillus's other arguments, it ignores the possibility that Navillus's alleged delays caused damages

which were not incurred until later.

*Second*, Navillus argues that its alleged delays could not have proximately caused CNY's

"alternative" alleged actual delay damages because, when the Original Owner sold the Project to

the Successor Owner, CNY entered into a "Closeout Agreement" with the Successor Owner which, according to Navillus, provided that the Successor Owner would "pay all of CNY's costs of the work, including all past due and future General Conditions costs," with "no carve out or exception to this obligation for any General Conditions attributable to the Navillus delays to the Project," meaning that any unpaid General Conditions were caused by the Successor Owner's breach of the Closeout Agreement, not by Navillus. [ECF No. 108 at 17–20]. This is a mischaracterization of the Closeout Agreement, which actually provided that the Successor Owner would pay CNY, "on an ongoing basis," for "all costs and expenses of the Work, including, among other things, all general conditions" "*[w]ith respect to [CNY's] work, labor and services performed after December 31, 2018 (the 'Work')*." [ECF No. 106-42 at 2 of 60] (emphasis added). By these express terms, 20 TSQ had no obligation to pay CNY for any General Conditions incurred *before* December 31, 2018, including any caused by Navillus's alleged delays. Even if 20 TSQ had such an obligation, Navillus cites no authority for the proposition that a party waives its ability to seek damages merely because a third party agreed to reimburse those damages and then did not do so. The Court declines to adopt such a rule in this case, particularly in light of the cases referenced above, which hold that even actual reimbursement by a third party does not waive a party's ability to seek damages.

*Third,* Navillus argues that it could not have caused CNY or 20 TSQ[8] to incur any actual damages because, to help obtain financing for the sale of the Project from the Original Owner to the Successor Owner, CNY provided the lending bank a document (the so-called "Estoppel Certificate") in which CNY "represent[ed] that its Work [was] in compliance with the critical path

---

[8] Navillus also argues that, because 20 TSQ has suffered no actual damages, the Contract's liquidated damages provision is unenforceable, and CNY may recover no liquidated damages on behalf of 20 TSQ. [ECF No. 108 at 22 (collecting cases)]. The Court need not engage with the parties' dueling caselaw on this issue, however, because, as discussed below, Navillus has failed to eliminate factual issues regarding whether 20 TSQ has suffered actual damages.

of the progress schedule dated April 25, 2018." [ECF No. 106-45 at 6 of 110]. Navillus also emphasizes that "[t]here is no reference in this document to delays to project completion by Navillus or any other contractor" and that "Paragraph 10 of the Estoppel . . . represents that the only known claims are listed in Exhibit E to the document," which does not "refer to any delay damage claim issued to Navillus." [ECF No. 108 at 19, 21]. Thus, Navillus contends that the Estoppel Certificate shows that "the Project was on schedule as it existed in April 2018, which was later than the period of delays that CNY subsequently allocated to Navillus." [*Id.*]. CNY responds, however, that "[t]he April 25, 2018 schedule given to the Lender incorporates and reflects the project delay that had then already occurred." [ECF No. 113 at 22]. Thus, while the Estoppel Certificate could suggest that any alleged delays by Navillus had been cured, it could also suggest that CNY had merely updated the Project schedule to account for those alleged delays. Similarly, while the omission of any delay damages claims from the list of CNY's "known claims" could suggest that CNY had (and has) no such claims, it could also suggest that CNY simply did not incur those damages (or did not know the extent of them) until later, as discussed above. Navillus's reliance on the Estoppel Certificate therefore does not eliminate triable fact questions.

*Fourth*, Navillus argues that it could not have proximately caused 20 TSQ to incur any actual delay damages because the PSA between the Original Owner and the Successor Owner did not "reserv[e] any delay claims," and, therefore, "the consideration paid by [the Successor Owner] for the Project, by necessity, included (and was presumably adjusted for) the delayed completion of the Project, including the 94 days of delay allegedly caused by Navillus." [ECF No. 108 at 21–22]. As CNY points out in response, "Navillus has not pointed to any contractual provision or legal authority which would have *required* buyer and seller to 'refer' or 'reserve' their claims against Navillus for project delay," especially considering that "neither CNY nor Navillus are even a party to the purchase and sale agreement." [ECF No. 113 at 32]. Further, as CNY at least

plausibly contends, "[b]ased on the no waiver provision [of the Contract between CNY and Navillus] and the fact that Navllus' delay was still accruing and had not yet been calculated, Ownership had no duty or obligation to 'reference' or 'reserve' its delay claims against Navillus at the time of the purchase and sale agreement." [*Id.* at 33].

*Finally*, Navillus argues that the "Liquidating Agreement" between CNY and 20 TSQ—that is, the separate agreement enabling CNY to pursue recovery of liquidated damages on behalf of 20 TSQ—is "inconsistent with the Assignment of the Owner's Navillus Claim to CNY" because "[a]n assignment connotes a conveyance of the claim to CNY for consideration whereas a liquidating agreement constitutes a passing through of a claim still owned by the Owner," so the Liquidating Agreement "is neither a legitimate pass-through claim [n]or an assignment of the Owner's claims." [ECF No. 108 at 22]. This appears to be a standing argument (or something like one), but Navillus cites no authority and provides no additional context for it, and the Court finds it hard to follow—particularly considering that the Liquidating Agreement itself contains a very explicit "Assignment of Claims and Causes of Action" from 20 TSQ to CNY that, by its terms, almost certainly encompasses 20 TSQ's right to liquidated delay damages. [ECF No. 106-48 at 7–9 of 9 ("Assignor hereby transfers and assigns all of Assignor's right, title, and interest in and to all Claims . . . and causes of action . . . of every nature and description which it now has or may hereafter have against Navillus . . . in connection with construction of the project . . . , including without limitation claims and causes of action against Navillus for any and all losses and damages sustained by the Assignor, including without limitation, for all actual damages, compensatory damages, consequential damages, liquidated damages arising out [of] or related to Navillus' acts or omissions arising out of, or in any way related to, the Project, whether for deficient or non-conforming work or materials, for delays, for interference with the efficient completion of the Project, and including Claims for breach of contract . . . .")]. For present

35

purposes, it suffices to conclude that Navillus has not eliminated any factual disputes regarding the legitimacy and effect of the Liquidating Agreement.

Thus, for the reasons discussed above, Navillus is not entitled to summary judgment dismissing CNY's claims for delay damages.

## VI.   Navillus Is Entitled to Summary Judgment Capping Delay Damages Alleged on Behalf of CNY and 20 TSQ at $1,000,000

Finally, Navillus is entitled to summary judgment capping any delay damages that may ultimately be awarded to CNY and/or 20 TSQ at $1,000,000.  In its Opening Brief, Navillus's entire argument on this point reads as follows:  "Paragraphs 3.02 and 6.02 [of the Contract] provide that any delay damage claims of CNY and the Owner are capped at $1,000,000.  Since CNY has so far refused to acknowledge this cap on delay damages, Navillus seeks a finding enforcing this limit, only in the event, of course, that the delay claims are not dismissed."  [ECF No. 108 at 22–23].  Navillus is correct that ¶¶ 3.02.2 and 6.02 of the Contract both provide, "Liquidated damages and/or actual damages as a result of Trade Contractor's delays shall be capped at one million dollars ($1,000,000)."  [ECF No. 106-1 at 5 of 78; ECF No. 106-2 at 25 of 65].

CNY appears to concede this point in its Opposition. [ECF No. 113 at 4 (referring to "$1,000,000 in 'capped' delay damages"); *id.* at 23 ("Pursuant to Article 6 and identical provisions of Article 3 to the Contract, based on 94 days of project delay admitted by Navillus, Navillus is liable to CNY for liquidated damages of $10,000 per day, which is $940,000, plus 'actual damages' to be proven at trial, subject to an aggregate cap of $1,000,000.").  And CNY expressly conceded the point during the Hearing [Hearing Tr. at 59:21–60:9 (CNY's Counsel:  "[T]here's really no legal dispute that the delay damages are capped at a million dollars.  . . ." The Court:  "It's liquidated and actual [delay damages] combined."  CNY's Counsel:  "You're right.  It is.  It is both.  It's both categories of [delay] damages are capped at a million dollars.")].

In light of CNY's concessions and the unambiguous language of the Contract, the Court grants the Motion to the limited extent that all delay damages asserted on behalf of CNY and 20 TSQ are capped at $1,000,000. This holding concerns *delay* damages only; it does not affect CNY's rights to pursue recovery of back-charges or any other types of alleged damages.

## **CONCLUSION**

For the reasons stated above, Navillus's Motion is **denied in part and granted in part** solely as to the contractual $1,000,000 cap on delay damages; CNY's informal request for partial summary judgment is **denied**; and the Court, on its own motion, **grants** partial summary judgment in favor of CNY precluding any PPA-based award to Navillus for anything other than statutorily required interest.

It is so ordered.

Dated: New York, New York
      August 7, 2023

                                    *s/ David S. Jones*
                                Honorable David S. Jones
                                United States Bankruptcy Judge